

_James F. Schneider_
**JAMES F. SCHNEIDER**
**U. S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND

In re:                                          *

PREMIER AUTOMOTIVE                              *    Case No. 05-20168-JS
SERVICES, INC.,
                          Debtor                *        Chapter 11

*    *    *    *    *    *    *    *    *    *    *    *    *

THE MARYLAND PORT                              *
ADMINISTRATION,
                                                *
                          Movant

v.                                              *

PREMIER AUTOMOTIVE                              *
SERVICES, INC.,

                          Respondent           *

*    *    *    *    *    *    *    *    *    *    *    *    *

PREMIER AUTOMOTIVE                              *
SERVICES, INC.,
                                                *
                          Plaintiff

                                                *    Adv. Proc. No. 05-1378-JS

v.

ROBERT L. FLANAGAN, Et al.        *

                    Defendants        *

*     *     *     *     *     *     *     *     *     *     *     *     *

## MEMORANDUM OPINION GRANTING SUMMARY JUDGMENT TO THE DEFENDANTS AND RELIEF FROM THE AUTOMATIC STAY TO THE MARYLAND PORT ADMINISTRATION

The Chapter 11 debtor is a tenant holding over land owned by the State of Maryland after the expiration and nonrenewal of a long-term lease. The instant Chapter 11case was filed to prevent the State from evicting the debtor from the property. The debtor filed the instant complaint against the defendants in their official capacities as officers of the State to for damages and to compel the Maryland Port Administration[1] to execute a new lease to the debtor on terms more favorable than those the State found acceptable. Because the defendants are entitled to judgment as a matter of law, their motion for summary judgment will be granted, as well as the motion of the Maryland Port Administration for relief from the automatic stay.

## *FINDINGS OF FACT*

---

[1]When it was first created by Laws 1956, Special Session, ch. 2, s 1, the MPA was known as the Maryland Port Authority. Its name was changed to Maryland Port Administration by Laws 1970, ch. 526, s 1, at which time it became a part of the Department of Transportation, Md.Transp.Code Ann. s 6-201. *Maryland Port Administration v. I.T.O. Corp. of Baltimore*, 40 Md. App. 697, 699, 395 A.2d 145, 146, fn. 3 (1978).

2

The debtor, Premier Automotive Services, Inc. ("Premier"), is a Baltimore-based import/export vehicle processing center located at the Dundalk Marine Terminal (the "Terminal"), a facility of the port of Baltimore that is owned and managed by the Maryland Port Administration ("MPA"), an agency of the State of Maryland, created in Title 6 of the Maryland Transportation Code.[2]

---

[2]The State's comprehensive scope of its interest in and control over the operation of its ports is set forth in Maryland Transportation Code § 6-102:

**TITLE 6. PORTS**
**SUBTITLE 1--DEFINITIONS; GENERAL PROVISIONS**
**§ 6-102. Legislative purpose**

(a) The General Assembly of Maryland makes the following declarations of its intent in the enactment of this title.

(b) The ports and harbors of this State are assets of value to the entire State. The residents of all parts of this State benefit directly from the waterborne commerce that they attract and service. Any improvement to these ports and harbors that increases their export and import commerce will benefit the people of the entire State.

(c)(1) The purpose of this title is to increase the waterborne commerce of the ports in this State and, by doing so, benefit the people of this State.

(2) Commerce may be attracted to these areas by:

(i) Developing existing facilities to provide quicker, cheaper, and better handling of cargoes; and

(ii) Effectively advertising and promoting the facilities and the use of the several port areas.

Premier, formerly known as "The Maryland Undercoating Co., Inc.," has occupied Lot 90 at the Terminal as a tenant of MPA continuously since 1964. Its business is the processing of motor vehicles, including automobile, trucks, military,

---

(d)(1) Since existing port and terminal facilities of Baltimore and other port areas have been provided mostly by private enterprise, the General Assembly seeks primarily to improve the facilities and strengthen the workings of the private operators.

(2) However, the private operators in the port areas have a public responsibility to provide modern port and harbor facilities suited to the needs of the public that they serve. Therefore, the Administration should have power to obtain information about the rates and practices of private operators, and, while it should assist and encourage the extension and improvement of privately operated port facilities, it also should have the power, if private facilities are inadequate or inadequately operated at any time, to construct and, if necessary, to operate any supplementary public facilities that it considers to be required in the public interest.

(e) The development of ports able to attract increasing amounts of waterborne commerce will require the construction of additional modern facilities and installations. A public port authority, using public funds, will be able to construct and, if necessary, operate these facilities and installations if the immediate financial returns are not sufficient to attract private capital.

(f) In order to meet increased competition from other states' ports that are operated with public funds either directly as state agencies or indirectly as private operating companies, the Administration should have the authority, subject to approval of the Commission, to operate public port facilities either directly or indirectly in the form and manner that the Commission deems necessary.

*Id.*

4

agricultural and construction equipment through the port. Lot 90 is the location upon which the debtor constructed a 27,500 square-foot building ("the Building") at the beginning of its occupancy. The Building contains a body shop, a paint shop, offices and a wash line. Premier also occupies Lot 401 at the Terminal pursuant to a separate sublease. Lot 401 is used for equipment assembly and as a storage facility.

On July 28, 1992, Premier and MPA entered into a written lease for Lot 90 and other parcels not relevant to this lawsuit. On July 1, 1997, Premier and MPA renewed the lease for five years, continuing in effect the terms and conditions of the original lease. The renewed lease with a slightly different acreage terminated on June 30, 2002. Upon its expiration, the lease provided that Premier became a month-to-month tenant. The lease provided that at the conclusion of its tenancy, Premier was required to remove any buildings it had erected or, with the approval of MPA, to abandon the buildings to the MPA. Lease, Article 4, Sec. 2.[3]

---

[3]Article 4.2 of the lease provided, as follows:

> Any and all buildings. . .erected or caused to be erected by PREMIER upon the leased premises at PREMIER' s expense shall be owned by PREMIER and must be removed by it at its expense upon the termination of this LEASE or any renewal thereof; or, in the event that PREMIER request, in writing, MPA's permission to leave any and all buildings. . .erect and intact and MPA specifically notifies PREMIER in writing that MPA specifically allows and agrees that the buildings . . .erected by PREMIER may remain in place. . . .In the event that MPA does allow and agree that the buildings. . . erected by PREMIER are to

As of June 30, 2002, the parties had not executed a new lease.  Premier objected to certain proposed terms contained in a new five-year lease submitted by MPA.  One such provision contained in Section 2.1(b)(the "vehicle guarantee, " or "thruput"), required that Premier "receive, process and distribute a minimum of 1,700 vehicles per acre of useable vehicle storage area of the Premises" per lease year to avoid additional fees.  A second provision Section 1.5 ("Relocation"), gave MPA "the right and option, at MPA's sole discretion, to relocate the Premises or any portion thereof, to a comparable facility" with 180 days' notice.  During the years 2002 through 2004, MPA proposed leases to Premier similar to that proposed in 2002.  Each time, Premier refused to accept the terms proposed by MPA.

On March 29, 2005, MPA requested that Premier vacate Lot 90 on or before May 1, 2005.  On April 29, 2005,  Premier filed the instant Chapter 11 bankruptcy case.  The schedules and statements filed by the debtor [P. 28] indicate that it was solvent on the date of filing.[4]  MPA is listed as a creditor holding a claim in the

---

remain intact after the termination date of this LEASE or any renewal thereof, PREMIER agrees that ownership of all of the aforementioned buildings. . . shall pass to and be made the property of MPA. . .

*Id.*

[4]Premier's summary of schedules discloses assets of $105,511.29, and liabilities of $14,091.40.

amount of $17,045.08, that is not included in the schedules.  MPA did not file a proof of claim.  The schedules indicate that Premier had no secured creditors.  On Schedule G, Premier listed the real property lease with MPA "dated July 28, 1992 as amended from time to time" as an executory contract or unexpired lease.[5]

On May 6, 2005, Premier filed the first of three complaints for declaratory judgment, preliminary and permanent injunction and ancillary damages against the defendants, Robert L. Flanigan, in his official capacity as Secretary of the Maryland Department of Transportation, M. Kathleen Broadwater, in her official capacity as Acting Executive Director of MPA, and MPA itself.  The complaint was based on MPA's alleged failure to negotiate in good faith the terms of a new long term lease of Lot 90, and was brought pursuant to 42 U.S.C. § 1983 for an alleged denial of substantive due process and equal protection and unlawful taking..  In addition to injunctive and declaratory relief, the complaint sought an award of damages and attorneys fees.

Count I alleged that MPA infringed the debtor's property interests, including the Building, fixtures and improvements, contracts with customers, goodwill and the

---

[5]On July 29, 2005, this Court granted the debtor's unopposed motion to extend time to assume or reject unexpired leases of non-residential real property [P. 35] until 60 days after the entry of a final order in the instant adversary proceeding.

business as a "going concern," that are subject to protection by the Fourteenth Amendment.[6]

Count II claimed that MPA intends to take Premier's private property, namely the Lot 90 leasehold, together with the Building, fixtures and its business, for governmental use without just compensation.

Count III alleges a denial of equal protection by MPA having targeted the debtor for discrimination out of a group of similarly situated tenants. Premier argued that MPA refused to negotiate a commercially-fair and reasonable lease with Premier while it offered a leasehold interest to The Pasha Group ("Pasha"), a competitor of Premier on more favorable terms.

Count IV alleged a violation of the State law requirement of "fair dealing."

---

[6]The Fourteenth Amendment to the U.S. Constitution provides, as its pertains to the debtor's claims, as follows:

**Amendment XIV**

Section 1.  All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.  No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. . . .

*Id.*

8

On June 13, 2005, the defendants filed a motion to dismiss [P. 6], to which the debtor responded by filing an amended complaint [P.13], on June 22, 2005 . The amended complaint substituted F. Brooks Royster, III, in his official capacity as Executive Director of MPA, in place of M. Kathleen Broadwater, and deleted Count IV (fair dealing). On October 28, 2005, the MPA filed its motion for relief from stay, to evict Premier from Lot 90.

Meanwhile, MPA, through M. Catherine Orleman, Esquire, its so-called "Principal Counsel," sent the following letter on letterhead of the Attorney General of the State of Maryland, dated October 3, 2005, to Charles S. Fax, Esquire, counsel to Premier:

> As you know, I met with Jim Robinson,[7] Janet West[8] and Helen Bentley[9] recently. During that meeting, Mr. Robinson expressed the opinion that the MPA was delaying approval of a proposed sublease from APS North Terminal, Inc. ("Amports") to Premier Automotive Services, Inc. ("Premier") for a portion of Lot 401 because of a dispute between Premier and MPA regarding Lot 90. I have investigated Mr. Robinson's concerns and can inform Premier that Mr. Robinson is mistaken. While it is true that MPA has decided not to authorize the proposed sublease, MPA's reasons stem from Premier's financial condition rather than from the current dispute between MPA and Premier over Lot 90.

---

[7]James G. Robinson, Director of Premier, who signed the corporate resolution that accompanied the voluntary Chapter 11 petition.

[8]Janet M. West, the corporate secretary of Premier, signed all three complaints.

[9]Helen Delich Bentley is a former Member of Congress from Maryland.

9

Premier filed for bankruptcy on April 29, 2005. It has not yet filed a plan of reorganization. In the bankruptcy action, Premier has alleged it must have a long-term lease at Lot 90 in order for its business to survive. However, Premier has no lease at Lot 90 and MPA has already made arrangements to lease Lot 90 to Pasha Automotive Services. Based on the information presented in the bankruptcy action, it is not clear to MPA that Premier will be able to reorganize and function as a viable port tenant.

MPA had discussions with Premier for approximately three years over a long-term lease at Lot 90. Premier refused to do more than stay there on a month-to-month basis. It is MPA's understanding that Premier is not financially in a position to make a long-term commitment to MPA. The bankruptcy filing confirms MPA's concerns that Premier is not a credit-worthy tenant.

Letter from Orleman to Fax, dated October 3, 2005.

On December 7, 2005, Premier filed a second amended complaint [P. 51], that restated the provisions of the amended complaint, but added a new Count IV, based upon 11 U.S.C. § 525[10] which is intended to protect a Title 11 debtor from

_____

[10]Section 525 of the Bankruptcy Code provides, as follows:

### § 525. Protection against discriminatory treatment

(a) Except as provided in the Perishable Agricultural Commodities Act, 1930, the Packers and Stockyards Act, 1921, and section 1 of the Act entitled "An Act making appropriations for the Department of Agriculture for the fiscal year ending June 30, 1944, and for other purposes," approved July 12, 1943, a governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the

employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act.

(b) No private employer may terminate the employment of, or discriminate with respect to employment against, an individual who is or has been a debtor under this title, a debtor or bankrupt under the Bankruptcy Act, or an individual associated with such debtor or bankrupt, solely because such debtor or bankrupt–

(1) is or has been a debtor under this title or a debtor or bankrupt under the Bankruptcy Act;

(2) has been insolvent before the commencement of a case under this title or during the case but before the grant or denial of a discharge; or

(3) has not paid a debt that is dischargeable in a case under this title or that was discharged under the Bankruptcy Act.

(c)(1) A governmental unit that operates a student grant or loan program and a person engaged in a business that includes the making of loans guaranteed or insured under a student loan program may not deny a student grant, loan, loan guarantee, or loan insurance to a person that is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, or another person with whom the debtor or bankrupt has been associated, because the debtor or bankrupt is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of a case under this title or during the pendency of the case but before the debtor is granted or

11

discrimination.  Premier claims that that MPA has refused to consent to a proposed

sublease between Amports as sublandlord and Premier as subtenant for Lot 401,

because Premier is in bankruptcy.[11]

The defendants did not renew their motion to dismiss but filed a motion for

summary judgment [P. 52] against the second amended complaint on December 27,

2005.

MPA asserts as a complete defense to the complaint the Eleventh Amendment

bar that protects the State from being sued in Federal court without its consent.[12]

---

denied a discharge, or has not paid a debt that is dischargeable in the case
under this title or that was discharged under the Bankruptcy Act.

(2) In this section, "student loan program" means any program
operated under title IV of the Higher Education Act of 1965 or a similar
program operated under State or local law.

11 U.S.C. § 525.

[11]This claim not set forth in the original complaint.  In the second amended
complaint, Premier added Count IV alleging a violation of 11 U.S.C. § 525 and 42
U.S.C. § 1983 stemming from MPA's denial of consent to a proposed renewed
sublease for Lot 401 agreed to by Premier and Amports, the sublandlord, on March
31, 2005. Premier argues that consent is withheld solely because it filed the instant
bankruptcy case.

[12]The Eleventh Amendment to the U.S. Constitution provides, as follows:

**Amendment XI.  Suits Against States**

The Judicial power of the United States shall not be construed to
extend to any suit in law or equity, commenced or prosecuted against one

MPA takes the position that the debtor has no Fifth or Fourteenth Amendment

of the United States by Citizens of another State, or by Citizens or
Subjects of any Foreign State.

*Id.* In *Hans v. Louisiana*, 134 U.S. 1, 105 S. Ct. 504, 33 L. Ed. 842, 849 (1890), the
Supreme Court extended the prohibition of the Eleventh Amendment to suits brought
against a State in Federal court by that State's own citizens.  The court pointedly
added, however:

> . . . [A]lthough the obligations of a state rest for their performance upon
> its honor and good faith, and cannot be made the subjects of judicial
> cognizance unless the state consents to be sued or comes itself into court,
> yet, where property or rights are enjoyed under a grant or contract made
> by a state, they cannot wantonly be invaded.  While the state cannot be
> compelled by suit to perform its contracts, any attempt on its part to
> violate property or rights acquired under its contracts may be judicially
> resisted, and any law impairing the obligation of contracts under which
> such property or rights are held is void and powerless to affect their
> enjoyment.  It is not necessary that we should enter upon an examination
> of the reason or expediency of the rule which exempts a sovereign state
> from prosecution in a court of justice at the suit of individuals.  This is
> fully discussed by writers on public law.  It is enough for us to declare
> its existence.  The legislative department of a state represents its polity
> and its will, and is called upon by the highest demands of natural and
> political law to preserve justice and judgment, and to hold inviolate the
> public obligations.  Any departure from this rule, except for reasons most
> cogent, (of which the legislature, and not the courts, is the judge,) never
> fails in the end to incur the odium of the world, and to bring lasting
> injury upon the state itself.  But to deprive the legislature of the power
> of judging what the honor and safety of the state may require, even at the
> expense of a temporary failure to discharge the public debts, would be
> attended with greater evils than such failure can cause.

*Hans v. Louisiana*, 134 U.S. at 20-1, 10 S. Ct. at 509, quoted In Westel Woodbury
Willoughby, 3 *Constitutional Law of the United States* 1391 (1929).

13

claims to Lot 90 because any rights to property that the debtor enjoyed were subject to the terms of the written lease that has since expired.  Therefore, any rights to which the debtor may be entitled are entirely contractual and must be litigated in the State court.

Premier claims that it is entitled to seek injunctive relief from the bankruptcy court to prevent a violation by the State of its rights under the Fifth and Fourteenth Amendments, arguing that the decision of the Supreme Court in *Ex parte Young*, 209 U.S. 123, 159-160, 28 S.Ct. 441,453 52 L.Ed. 714, 728-729 (1908), entitles it to seek injunctive and declaratory relief against state officers in Federal bankruptcy court to enjoin the infringement of its constitutional rights. The complaint asserts that this Court has subject matter jurisdiction over the instant complaint pursuant to 28 U.S.C. § 1 5 7 , [1] [3]

---

[13]Section 157 of Title 28 provides, as follows:

### § 157. Procedures

(a) Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.

(b)(1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158

14

of this title.

(2) Core proceedings include, but are not limited to–

(A) matters concerning the administration of the estate;

(B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;

(C) counterclaims by the estate against persons filing claims against the estate;

(D) orders in respect to obtaining credit;

(E) orders to turn over property of the estate;

(F) proceedings to determine, avoid, or recover preferences;

(G) motions to terminate, annul, or modify the automatic stay;

(H) proceedings to determine, avoid, or recover fraudulent conveyances;

(I) determinations as to the dischargeability of particular debts;

(J) objections to discharges;

(K) determinations of the validity, extent, or priority of liens;

15

(L) confirmations of plans;

(M) orders approving the use or lease of property, including the use of cash collateral;

(N) orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate;

(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims; and

(P) recognition of foreign proceedings and other matters under chapter 15 of title 11.

(3) The bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11. A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law.

(4) Non-core proceedings under section 157(b)(2)(B) of title 28, United States Code, shall not be subject to the mandatory abstention provisions of section 1334(c)(2).

(5) The district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending.

(c)(1) A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such

1331,[14] 1334[15] and 1343,[16] and that it has the power to grant declaratory relief

proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

(2) Notwithstanding the provisions of paragraph (1) of this subsection, the district court, with the consent of all the parties to the proceeding, may refer a proceeding related to a case under title 11 to a bankruptcy judge to hear and determine and to enter appropriate orders and judgments, subject to review under section 158 of this title.

(d) The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

(e) If the right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy judge, the bankruptcy judge may conduct the jury trial if specially designated to exercise such jurisdiction by the district court and with the express consent of all the parties.

28 U.S.C. § 157.

[14]Section 1331 of Title 28 provides:

### § 1331. Federal question

The district courts shall have original jurisdiction of all civil

actions arising under the Constitution, laws, or treaties of the United States.

28 U.S.C. § 1331.

[15]Section 1334 of Title 28 provides:

## § 1334. Bankruptcy cases and proceedings

(a) Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.

(b) Except as provided in subsection (e)(2), and notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

(c)(1) Except with respect to a case under chapter 15 of title 11, nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

(2) Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

(d) Any decision to abstain or not to abstain made under subsection (c) (other than a decision not to abstain in a proceeding

described in subsection (c)(2)) is not reviewable by appeal or otherwise by the court of appeals under section 158(d), 1291, or 1292 of this title or by the Supreme Court of the United States under section 1254 of this title. Subsection (c) and this subsection shall not be construed to limit the applicability of the stay provided for by section 362 of title 11, United States Code, as such section applies to an action affecting the property of the estate in bankruptcy.

(e) The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction–

(1) of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate; and

(2) over all claims or causes of action that involve construction of section 327 of title 11, United States Code, or rules relating to disclosure requirements under section 327.

28 U.S.C. § 1334.

[16]Section 1343 of Title 28 provides:

## § 1343. Civil rights and elective franchise

(a) The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

(1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42;

(2) To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 1985 of Title 42 which he had knowledge were about to occur and power to prevent;

19

pursuant to 28 U.S.C. §§ 105(a)[17], 2201[18] and 2202.[19]

_____

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

(b) For purposes of this section–

(1) the District of Columbia shall be considered to be a State; and

(2) any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

28 U.S.C.A. § 1343.

[17]Undoubtedly, the debtor meant to refer to 11 U.S.C. § 105(a), the so-called "All Writs Act," which provides, as follows:

### § 105. Power of court

(a)  The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.  No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

*Id.*

[18]Section 2201 of Title 28 provides:

*CONCLUSIONS OF LAW*

**BANKRUPTCY JURISDICTION**

_____

### DECLARATORY JUDGMENTS.  § 2201. Creation of remedy

(a) In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986, a proceeding under section 505 or 1146 of title 11, or in any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of merchandise of a free trade area country (as defined in section 516A(f)(10) of the Tariff Act of 1930), as determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

(b) For limitations on actions brought with respect to drug patents see section 505 or 512 of the Federal Food, Drug, and Cosmetic Act.

28 U.S.C. § 2201.

[19]Section 2202 of Title 28 provides:

### § 2202. Further relief

Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.

28 U.S.C. § 2202.

"Bankruptcy jurisdiction, at its core, is *in rem*." *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. ___, 126 S.Ct. 990, 995, 163 L. Ed.2d 945,  (2006), *citing Gardner v. New Jersey*, 329 U.S. 565, 574, 675 S. Ct. 467, 472, 91 L. Ed. 504, 515 (1947) ("The whole process of proof, allowance, and distribution is, shortly speaking, an adjudication of interests claimed in a *res*." *See also Local Loan Co. V. Hunt*, 292 U.S. 234, 244, 54 S. Ct. 695, 699, 78 L. Ed. 1230, 1235 (1934) ("Generally, proceedings in bankruptcy are in nature of proceedings *in rem*, and orders of discharge are equity decrees determining a status."). "A bankruptcy court's *in rem* jurisdiction permits it to 'determin[e] all claims that anyone, whether named in the action or not, has to the property or thing in question.'" *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 448, 124 S. Ct. 1905, 1911, 158 L. Ed.2d 764, 775 (2004), quoting 16 J. Moore, et al., *Moore's Federal Practice* § 108.70[1], p. 108-106 (3d ed. 2004).

"Property of the estate" as set forth in Section 541(a) of the Bankruptcy Code is an all-encompassing description of the debtor's interest in property over which the bankruptcy court has exclusive jurisdiction.[20]  As was stated in the case of *In re*

---

[20]Section 541(a) provides as follows:

(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) Except as provided in subsections (b) and (c)(2) of this section,

all legal or equitable interests of the debtor in property as of the commencement of the case.

(2) All interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is–

(A) under the sole, equal, or joint management and control of the debtor; or

(B) liable for an allowable claim against the debtor, or for both an allowable claim against the debtor and an allowable claim against the debtor's spouse, to the extent that such interest is so liable.

(3) Any interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this title.

(4) Any interest in property preserved for the benefit of or ordered transferred to the estate under section 510(c) or 551 of this title.

(5) Any interest in property that would have been property of the estate if such interest had been an interest of the debtor on the date of the filing of the petition, and that the debtor acquires or becomes entitled to acquire within 180 days after such date–

(A) by bequest, devise, or inheritance;

(B) as a result of a property settlement agreement with the debtor's spouse, or of an interlocutory or final divorce decree; or

(C) as a beneficiary of a life insurance policy or of a death benefit plan.

(6) Proceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case.

23

*Stoltz*, 283 B.R. 842, 844 (Bankr.D.Md.2002):

> Federal bankruptcy law sets the inclusive bounds of property of the bankruptcy estate, casting an all-encompassing net over assets of every kind and description in which a debtor enjoys any interest. 11 U.S.C. § 541(a). Non-bankruptcy state law governs the nature of the debtor's interest in property. *American Bankers Ins. Co. v. Maness*, 101 F.3d 358, 362 (4th Cir.1996); *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L. Ed.2d 136 (1979).

*Id*.

**LOT 90**

In order for this Court to have subject matter jurisdiction over the complaint as it touches upon Lot 90, the debtor's interest in Lot 90 must be property of the estate.[21] As will be recalled, the debtor had only a month-to-month tenancy since before the petition date, because the terms of the expired lease so provided. However, the debtor's right to occupy the premises as a tenant holding over is wholly dependent

---

> (7) Any interest in property that the estate acquires after the commencement of the case.

11 U.S.C. § 541(a).

[21]Assuming that the debtor seeks to recover property of the estate from MPA, this Court would have core jurisdiction over the complaint pursuant to 28 U.S.C. § 157(b)(2)(E) to issue "orders to turn over property of the estate." *Id.*

24

upon the expired lease.  Section 541(b) of the  Code provides that a lease that expired

before the filing of the bankruptcy petition is not property of the estate.[22]

Premier's tenancy of Lot 90 is terminable at the will of MPA as landlord.

*Chesapeake Bank of Maryland v. Monro Muffler/Brake, Inc.*, 166 Md. App. 695, 891

A.2d 384 (2006); Md. Real Property Code Sections 8-402 (the "tenant holding over"

statute),[23] which permits recovery upon a finding that the lease has expired, notice to

---

[22]Section 541(b)(2) provides as follows:

(b)(2)   any interest of the debtor as a lessee under a lease of
nonresidential real property that has terminated at the expiration of the
stated term of such lease before the commencement of the case under this
title, and ceases to include any interest of the debtor as a lessee under a
lease of nonresidential real property that has terminated at the expiration
of the stated term of such lease during the case[.]

11 U.S.C. § 541(b)(2).

[23]**§ 8-402. Tenant holding over; liability**

(a)(1) A tenant under any periodic tenancy, or at the expiration of
a lease, and someone holding under the tenant, who shall unlawfully
hold over beyond the expiration of the lease or termination of the
tenancy, shall be liable to the landlord for the actual damages caused by
the holding over.

(2) The damages awarded to a landlord against the tenant or
someone holding under the tenant, may not be less than the apportioned
rent for the period of holdover at the rate under the lease.

(3)(i) Any action to recover damages under this section may be
brought by suit separate from the eviction or removal proceeding or in

the same action and in any court having jurisdiction over the amount in issue.

(ii) The court may also give judgment in favor of the landlord for the damages determined to be due together with costs of the suit if the court finds that the residential tenant was personally served with a summons, or, in the case of a nonresidential tenancy, there was such service of process or submission to the jurisdiction of the court as would support a judgment in contract or tort.

(iii) A nonresidential tenant who was not personally served with a summons shall not be subject to personal jurisdiction of the court if that tenant asserts that the appearance is for the purpose of defending an in rem action prior to the time that evidence is taken by the court.

(4) Nothing contained herein is intended to limit any other remedies which a landlord may have against a holdover tenant under the lease or under applicable law.

(b)(1)(i) Where any tenancy is for any definite term or at will, and the landlord shall desire to repossess the property after the expiration of the term for which it was leased and shall give notice in writing one month before the expiration of the term or determination of the will to the tenant or to the person actually in possession of the property to remove from the property at the end of the term, and if the tenant or person in actual possession shall refuse to comply, the landlord may make complaint in writing to the District Court of the county where the property is located.

(ii) 1. The court shall issue a summons directed to any constable or sheriff of the county entitled to serve process, ordering the constable or sheriff to notify the tenant, assignee, or subtenant to appear on a day stated in the summons before the court to show cause why restitution should not be made to the landlord.

2. The constable or sheriff shall serve the summons on the tenant,

26

assignee, or subtenant on the property, or on the known or authorized agent of the tenant, assignee, or subtenant.

3. If, for any reason those persons cannot be found, the constable or sheriff shall affix an attested copy of the summons conspicuously on the property.

4. After notice to the tenant, assignee, or subtenant by first-class mail, the affixing of the summons on the property shall be conclusively presumed to be a sufficient service to support restitution.

(iii) Upon the failure of either of the parties to appear before the court on the day stated in the summons, the court may continue the case to a day not less than six nor more than ten days after the day first stated and notify the parties of the continuance.

(2)(i) If upon hearing the parties, or in case the tenant or person in possession shall neglect to appear after the summons and continuance the court shall find that the landlord had been in possession of the leased property, that the said tenancy is fully ended and expired, that due notice to quit as aforesaid had been given to the tenant or person in possession and that the tenant or person in possession had refused so to do, the court shall thereupon give judgment for the restitution of the possession of said premises and shall forthwith issue its warrant to the sheriff or a constable in the respective counties commanding the tenant or person in possession forthwith to deliver to the landlord possession thereof in as full and ample manner as the landlord was possessed of the same at the time when the tenancy was made, and shall give judgment for costs against the tenant or person in possession so holding over.

(ii) Either party shall have the right to appeal therefrom to the circuit court for the county within ten days from the judgment.

(iii) If the tenant appeals and files with the District Court an affidavit that the appeal is not taken for delay, and also a good and sufficient bond with one or more securities conditioned that the tenant

27

will prosecute the appeal with effect and well and truly pay all rent in arrears and all costs in the case before the District Court and in the appellate court and all loss or damage which the landlord may suffer by reason of the tenant's holding over, including the value of the premises during the time the tenant shall so hold over, then the tenant or person in possession of said premises may retain possession thereof until the determination of said appeal.

(iv) The appellate court shall, upon application of either party, set a day for the hearing of the appeal, not less than five nor more than 15 days after the application, and notice for the order for a hearing shall be served on the opposite party or that party's counsel at least 5 days before the hearing.

(v) If the judgment of the District Court shall be in favor of the landlord, a warrant shall be issued by the appellate court to the sheriff, who shall proceed forthwith to execute the warrant.

(3)(i) The provisions of this subsection shall apply to all cases of tenancies at the expiration of a stated term, tenancies from year to year, tenancies of the month and by the week. In case of tenancies from year to year (including tobacco farm tenancies), notice in writing shall be given three months before the expiration of the current year of the tenancy, except that in case of all other farm tenancies, the notice shall be given six months before the expiration of the current year of the tenancy; and in monthly or weekly tenancies, a notice in writing of one month or one week, as the case may be, shall be so given.

(ii) This paragraph (3), so far as it relates to notices, does not apply in Baltimore City.

(iii) In Montgomery County, except in the case of single family dwellings, the notice by the landlord shall be two months in the case of residential tenancies with a term of at least month to month but less than from year to year.

28

quit has been given and that the tenant has refused to vacate), *cited in Carter v.*

---

(4) When the tenant shall give notice by parol to the landlord or to the landlord's agent or representatives, at least one month before the expiration of the lease or tenancy in all cases except in cases of tenancies from year to year, and at least three months' notice in all cases of tenancy from year to year (except in all cases of farm tenancy, the notice shall be six months), of the intention of the tenant to remove at the end of that year and to surrender possession of the property at that time, and the landlord, the landlord's agent, or representative shall prove the notice from the tenant by competent testimony, it shall not be necessary for the landlord, the landlord's agent or representative to provide a written notice to the tenant, but the proof of such notice from the tenant as aforesaid shall entitle the landlord to recover possession of the property hereunder. This paragraph shall not apply in Baltimore City.

(5) Acceptance of any payment after notice but before eviction shall not operate as a waiver of any notice to quit, notice of intent to vacate or any judgment for possession unless the parties specifically otherwise agree in writing. Any payment accepted shall be first applied to the rent or the equivalent of rent apportioned to the date that the landlord actually recovers possession of the premises, then to court costs, including court awarded damages and legal fees and then to any loss of rent caused by the holdover. Any payment which is accepted in excess of the foregoing shall not bear interest but will be returned to the tenant in the same manner as security deposits as defined under § 8-203 of this title but shall not be subject to the penalties of that section.

(c) Unless stated otherwise in the written lease and initialed by the tenant, when a landlord consents to a holdover tenant remaining on the premises, the holdover tenant becomes a periodic week-to-week tenant if the tenant was a week-to-week tenant before the tenant's holding over, and a periodic month-to-month tenant in all other cases.

*Id.*

29

*Maryland Management Co.*, 377 Md. 596, 597-8, 835 A.2d 158, 159 (2003); and

*Brown v. Housing Opportunities Comm.*, 350 Md. 570, 714 A.2d 197 (1998).

The bankruptcy court has no authority to resuscitate a lease of real property that expired by its own terms prepetition, not even pursuant to Section 105 of the Code. *P & J Marketing, Inc. v. Old Chepachet Village, Inc.*, 142 B.R. 608 (Bankr. D. R.I. 1992). In the case of *In re Plaza de Diego Shopping Center, Inc.*, 911 F.2d 820 (1st Cir. 1990), the First Circuit stated that "even as a court of equity . . .the bankruptcy court's equitable discretion is limited and cannot be used in a manner inconsistent with the commands of the Bankruptcy Code." 911 F.2d at 830. Thus, Section 105 "does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity." *Wilner Wood Products Co. v. State of Maine, Dept. of Environmental Protection*, 128 B.R. 1, 3 (D. Me. 1991) (citing *United States v. Sutton,* 786 F.2d 1305, 1308 (5th Cir. 1986).

Similarly, the debtor has no cause of action against MPA pursuant to Section 542 of the Bankruptcy Code to recover non-estate property. *Cf. U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 204-6, 103 S. Ct. 2309, 2313-14, 76 L. Ed.2d 515, 522, fn. 8 and

fn. 10 (1983) (11 U.S.C. § 542 permits the recovery of property of the estate seized

prepetition by a secured creditor, in that case, the Internal Revenue Service).[24]

---

[24]        FN 8.  Section 541(a)(1) speaks in terms of the debtor's "interests . . . in property," rather than property in which the debtor has an interest, but this choice of language was not meant to limit the expansive scope of the section. The legislative history indicates that Congress intended to exclude from the estate property of others in which the debtor had some minor interest such as a lien or bare legal title.  *See* 124 Cong. Rec. 32399, 32417 (1978) (remarks of Rep. Edwards); *id.*, at 33999, 34016-34017 (remarks of Sen. DeConcini); *cf.* § 541(d) (property in which debtor holds legal but not equitable title, such as a mortgage in which debtor retained legal title to service or to supervise servicing of mortgage, becomes part of estate only to extent of legal title); 124 Cong. Rec. 33999 (1978) (remarks of Sen. DeConcini) (§ 541(d) "reiterates the general principle that where the debtor holds bare legal title without any equitable interest,  .  .  .  the estate acquires bare legal title without any equitable interest in the property").  Similar statements to the effect that § 541(a)(1) does not expand the rights of the debtor in the hands of the estate were made in the context of describing the principle that the estate succeeds to no more or greater causes of action against third parties than those held by the debtor.  *See* H.R. Rep. No. 95-595, pp. 367-368 (1977).  These statements do not limit the ability of a trustee to regain possession of property in which the debtor had equitable as well as legal title.

FN10.  *See, e.g.*, §§ 543, 547, and 548.  These sections permit the trustee to demand the turnover of property that is in the possession of others if that possession is due to a custodial arrangement, § 543, to a preferential transfer, § 547, or to a fraudulent transfer, § 548.  We do not now decide the outer boundaries of the bankruptcy estate.  We

31

**LOT 401**

As to the debtor's claim of alleged discrimination based upon the refusal of MPA to approve Premier's sublease of Lot 401, this Court has core jurisdiction pursuant to 28 U.S.C. 157(b)(2)(O), to entertain a suit brought pursuant to 11 U.S.C. § 525. *In re Hopkins*, 66 B.R. 828, 829(Bankr. W.D. Ark. 1986). The claim is a core proceeding because it arises under Title 11. *Blue Diamond Coal Co. v. Angelucci (In re Blue Diamond Coal Co.)*, 145 B.R. 895, 906 (Bankr. E.D. Tenn. 1992) (discussing Fourteenth Amendment due process claim and § 525 claim related to revoking certificate of self-insurance). "'Core proceedings are those matters 'integral to the core bankruptcy function of restructuring of debtor-creditor rights' including 'all necessary aspects of a bankruptcy case.'" *Edgcomb Metals Co. v. Eastmet Corp.*, 89 B.R. 546, 548 (D.Md.1988)." *Allnutt v. Assoc. Leasing, Inc. (In re Allnutt )*, 220 B.R.

---

note only that Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition. *See* § 541(b); H.R. Rep. No. 95-595, p. 368 (1977); S. Rep. No. 95-989, p. 82 (1978). Although it may well be that funds that the IRS can demonstrate were withheld for its benefit pursuant to 26 U.S.C. § 7501 (employee withholding taxes), are excludable from the estate, *see* 124 Cong. Rec. 32417 (1978) (remarks of Rep. Edwards) (Service may exclude funds it can trace), the IRS did not attempt to trace the withheld taxes in this case. *See* Tr. of Oral Arg. 18, 28-29.

*Id.*

32

871, 884 (Bankr.D.Md.1998), *aff'd*, 238 F.3d 410 (4th Cir.2000), *cert. denied*, 534 U.S. 814 (2001).

"Section 525(a) evolved from *Perez v. Campbell*, 402 U.S. 637, 91 S. Ct. 1704, 29 L. Ed.2d 233 (1971), a seminal bankruptcy case in which the Supreme Court struck down a state statute that withheld driving privileges from debtors who failed to satisfy motor-vehicle-related tort judgments against them, even if the judgments were discharged under bankruptcy law." *In re Stoltz*, 315 F.3d 80, 87 (2d Cir.2002). Congress codified the result in *Perez* when it enacted what is now Section 525(a) of the Bankruptcy Code, prohibiting governmental units from discriminating against debtors who have filed bankruptcy.

The debtor points to the October 3, 2005 letter from MPA counsel to Mr. Fax as undeniable proof that MPA has violated Section 525 by basing its refusal to assent to a sublease by Premier upon the latter's status as a debtor in bankruptcy. However, even with this seemingly damning evidence, the debtor cannot prevail. Section 525 requires a showing that the prohibited conduct was based "***solely*** because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was

33

discharged under the Bankruptcy Act." *Emphasis supplied*. 11 U.S.C. § 525(a). The letter itself makes clear that the filing of bankruptcy by the debtor was not the only reason the MPA denied approval of the sublease, although it may have been the dominant one. Also mentioned was the protracted refusal of the debtor to accept the terms of a long term lease of Lot 90 proposed by the State. The refusal was not based upon the failure of the debtor to pay a debt.

The MPA is a State agency created by the Maryland General Assembly and clothed with comprehensive powers to administer the ports and harbors in the state.[25]

---

[25]Section 6-204 of the Maryland Transportation Code sets forth the powers and authority of the MPA:

### § 6-204. General authority of Administration

(a) In addition to the specific powers granted under this title, and subject to the supervision of the Commission, the Administration has the powers granted by this section.

(b) The Administration may sue and be sued in its own name.

(c) The Administration may propose for adoption by the Commission regulations to carry out the provisions of this title.

(d) Either directly or by expert consultants, the Administration may make any investigations and surveys, including:

(1) Studies of business conditions, freight rates, and port services;

(2) Physical surveys of the conditions of channels and structures;

(3) Studies of the need for additional port facilities to develop, improve, and more speedily handle commerce; and

(4) Any other study, survey, or estimate necessary for the exercise of its powers under this title.

(e) The Administration may apply for and receive grants from any federal agency for the planning, construction, operation, or financing of any port facility and may receive aid or contributions of money, property, labor, or other things of value from any source, to be held, used, and applied for the purposes for which the grants, aid, and contributions are made.

(f) The Administration may do anything necessary to promote and increase commerce within its territorial jurisdiction, including:

(1) Purchasing advertising;

(2) Engaging in public relations programs;

(3) Publishing literature;

(4) Soliciting business by correspondence and traveling representatives; and

(5) Cooperating with civic, technical, professional, and business organizations and associations.

(g) To increase the commerce of ports in this State, the Administration may establish and maintain a traffic bureau or other office to investigate and seek improvement in rates, rate structures, practices, and charges affecting these ports.

(h)(1) Except as provided in paragraph (2) of this subsection, the Administration may apply for the establishment, maintenance, and operation of foreign trade zones within its territorial jurisdiction and may

operate and maintain these zones under the laws or regulations of the United States for the establishment, operation, and maintenance of foreign trade zones in ports of entry of the United States.

(2) The Administration may not apply for the establishment, operation, and maintenance of a foreign trade zone unless it has the specific approval of the Board of Public Works. Approval of the Board of Public Works shall be based on information and advice, as received from the Department of Natural Resources, the Department of Business and Economic Development, other interested agencies of this State, and the county government of each involved county, on the potential effects of the foreign trade zone on the water resources, fisheries, and economic life of this State.

(i) The Administration may acquire, construct, reconstruct, rehabilitate, improve, maintain, lease as lessor or as lessee, repair, and operate either directly or through State created private operating companies port facilities within its territorial jurisdiction, including the dredging of ship channels and turning basins and the filling and grading of land.

(j) The Administration may designate the location and character of all port facilities and improvements that the Administration holds, owns, or over which it is authorized to act, and it may regulate all matters related to the location and character of these facilities and improvements.

(k)(1) In the exercise of its powers and the performance of its duties under this title, the Administration may acquire and hold in its own name and may lease, convey, or otherwise dispose of any property, including:

(i) Lands lying under water;

(ii) Riparian rights in and adjacent to lands; and

(iii) Property devoted to a public use in or near the navigable

waters within the territorial jurisdiction of the Administration.

(2) The acquisition by or on behalf of the Administration of personal property to be used outside of this State is not subject to Title 4, Subtitle 3 of the State Finance and Procurement Article requiring purchases through the Department of General Services.

(l) The Administration may fix, revise, charge, and collect rates, fees, rentals, or other charges for the use of any project under its control.

(m) The Administration may appear in its own behalf before any board, commission, department, or agency of the federal government, of any state, or of any international conference and before any committee of the Congress of the United States or the General Assembly of Maryland, or any appropriate nongovernmental body, in any matter:

(1) That relates to the design, establishment, construction, extension, operation, improvement, repair, or maintenance of a project operated and maintained by the Administration under this title;

(2) That relates to rail rates, water rates, port services and charges, demurrage, switching, wharfage, towage, pilotage, differentials, discriminations, labor relations, trade practices, river and harbor improvements, aids to navigation, or permits for structures in navigable waters; or

(3) That affects the physical development or business interest of the Administration and those it serves.

(n)(1) The Administration may employ consulting engineers, accountants, attorneys, construction and financial experts, superintendents, traveling representatives, managers, clerks, stenographers, and laborers, and any other agents and employees that it considers necessary to carry out the provisions of this subtitle.

(2) This subsection does not affect the duties of the Attorney General specified in § 2-106 of this article.

(o) The Administration may do anything else necessary or

37

convenient to carry out the powers granted in this title.

(p) The exercise of the powers under this title is an essential governmental function of the State.

(q)(1) The Administration, with the approval of the Commission, may create private operating companies for the purpose of operating public port facilities.

(2)(i) The Commission may appoint up to a total of 12 management personnel employees to perform services for all private operating companies created under this subsection.

(ii) Notwithstanding any other provision of law, the Commission may determine the qualifications and appointment, as well as compensation and leave, for employees appointed under this subsection.

(iii) At least 10 days before the effective date of the change, the Commission shall submit to the Secretary of Budget and Management each change to the salaries of these employees that involves increases in salary ranges other than those associated with general salary increases approved by the General Assembly.

(iv) The Secretary of Budget and Management shall:

1. Review the proposed changes; and

2. Within 10 days of receipt of the proposed changes, advise the Commission whether the changes would have an adverse effect on special fund expenditures.

(v) Failure of the Secretary of Budget and Management to respond in a timely manner is deemed to be a statement that the change will have no adverse effect.

38

The record is clear that in addition to the fact that the debtor has filed bankruptcy, the MPA has an interest in maintaining creditworthy tenants in possession of property at the Terminal. The State through MPA owns and has complete control over the Terminal and the many tenants who operate businesses there. In this regard, the instant case is similar to that of *Christmas v. Md. Racing Comm'n (In re Christmas)*, 102 B.R. 447, 460-81 (Bankr.D.Md.1989), in which this Court upheld the revocation of horse trainer's license by the State Racing Commission, holding that

---

       (vi) Employees appointed under this subsection are State employees and shall be entitled to participate in the retirement and pension systems for employees of the State of Maryland authorized under Division II of the State Personnel and Pensions Article.

       (vii) On or before December 1 of each year, the Commission shall report to the Governor and the Legislative Policy Committee of the General Assembly on actions taken by the Commission under this subsection during the previous fiscal year with regard to individuals subject to this subsection.

       (3) The budget submitted by the Governor to the General Assembly shall include personnel detail for the private operating companies in the form and manner provided for an agency in the State Personnel Management System.

       (4) Other than employees appointed by the Commission under paragraph (2) of this subsection, employees of a private operating company created under this subsection are not State employees.

*Id.*

horse racing was an industry strictly-regulated by state government for the benefit of the sport and the economic welfare of the State.

**RELIEF FROM THE AUTOMATIC STAY**

The Court has core jurisdiction to grant or deny the relief from the automatic stay of 11 U.S.C. § 362,[26] pursuant to 28 U.S.C. § 157(b)(2)(G) (motions

---

[26]11 U.S.C. § 362(a) provides, as follows:

### Section 362.  Automatic stay

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of--

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

(4) any act to create, perfect, or enforce any lien against property of the estate;

(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

41

to terminate, annul, or modify the automatic stay).

The MPA has moved for relief from stay based upon Section 362(d).[27]

---

(7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and

(8) the commencement or continuation of a proceeding before the United States Tax Court concerning a corporate debtor's tax liability for a taxable period the bankruptcy court may determine or concerning the tax liability of a debtor who is an individual for a taxable period ending before the date of the order for relief under this title.

11 U.S.C. § 362.

[27]Section 362(d) provides as follows:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay–

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

(2) with respect to a stay of an act against property under subsection (a) of this section, if–

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization;

(3) with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the

entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later–

(A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or

(B) the debtor has commenced monthly payments that–

(i) may, in the debtor's sole discretion, notwithstanding section 363(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien); and

(ii) are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate; or

(4) with respect to a stay of an act against real property under subsection (a), by a creditor whose claim is secured by an interest in such real property, if the court finds that the filing of the petition was part of a scheme to delay, hinder, and defraud creditors that involved either–

(A) transfer of all or part ownership of, or other interest in, such real property without the consent of the secured creditor or court approval; or

(B) multiple bankruptcy filings affecting such real property.

If recorded in compliance with applicable State laws governing notices of interests or liens in real property, an order entered under paragraph (4) shall be binding in any other case under this title purporting to affect such real property filed not later than 2 years after

Relief from the automatic stay is appropriately accorded to a lessor of property subject to a lease that expired prepetition because the debtor may only assume an executory lease in bankruptcy. *Prudential Investments Co. v. Physique Forum Gym, Inc. (In re Physique Forum Gym, Inc.)*, 27 B.R. 691 (Bankr. D. 1982). An expired lease is therefore "beyond the pale" of Section 365.[28] For purposes of the automatic stay, the debtor's "slight" possessory interest in property is sufficient to trigger the protection of 11 U.S.C. § 362(a).[29] *Phoenix Assoc., Inc. v. Pagoda International, Inc.*

---

the date of the entry of such order by the court, except that a debtor in a subsequent case under this title may move for relief from such order based upon changed circumstances or for good cause shown, after notice and a hearing. Any Federal, State, or local governmental unit that accepts notices of interests or liens in real property shall accept any certified copy of an order described in this subsection for indexing and recording.

11 U.S.C. § 362(d).

[28]Section 365(a) of the Bankruptcy Code provides as follows:

### § 365. Executory contracts and unexpired leases

(a) Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

11 U.S.C. § 365.

[29]Section 362(a) provides:

### § 362. Automatic stay

44

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of–

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

(4) any act to create, perfect, or enforce any lien against property of the estate;

(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

(7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and

(8) the commencement or continuation of a proceeding before the United States Tax Court concerning a corporate debtor's tax liability for

45

*(In re Pagoda International, Inc.)*, 26 B.R. 18 (Bankr. D. Md. 1982).  To the extent that the debtor's month to month tenancy is considered an executory lease, it is a mere allusion because the debtor's assumption of it will not provide permanent relief.

There is an additional ground to grant relief from the automatic stay in this case. The Court finds that Premier filed the instant Chapter 11 bankruptcy petition in bad faith.  *See Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir.1989), in which the Fourth Circuit held that both objective and subjective bad faith must be found in order to find that a bankruptcy petition was filed in bad faith.  To find subjective bad faith, the facts must indicate that the true motivation of the debtor in filing for bankruptcy relief was "to abuse the reorganization process" and "to cause hardship or to delay creditors by resort to the Chapter 11 device merely for the purpose of invoking the automatic stay, without an intent or ability to reorganize his financial activities."  *Carolin*, 886 F.2d at 702, quoting *In re Thirtieth Place, Inc.*, 30 B.R. 503, 505 (BAP 9th Cir.1983).  The finding of objective bad faith requires the Court to determine that the debtor's expectations of rehabilitation in the context of a  bankruptcy case are objectively futile.  *Carolin*, 886 F.2d at 701.

--------

a taxable period the bankruptcy court may determine or concerning the tax liability of a debtor who is an individual for a taxable period ending before the date of the order for relief under this title.

11 U.S.C. § 362.

With respect to subjective bad faith, this Court finds that Premier filed the instant bankruptcy case for the sole purpose of halting and/or delaying its ultimate eviction from the Terminal by MPA. The debtor was not experiencing financial difficulties when it filed the petition. As indicated, it was solvent, according to the information it supplied in its schedules.

The debtor's only nemesis is MPA, and its dispute did not relate to any claim by MPA against Premier. *Cf. In re William Steiner, Inc.*, 139 B.R. 356 (Bankr.D.Md.1992) (Filing of Chapter 11 proceeding *held* to be *per se* in bad faith, where debtor, who had no unsecured debts, other than state taxes, which it denied owing, had no demonstrable need to reorganize, had no legitimate reorganization purposes, had not exhausted remedies available under state law and was using the automatic stay to thwart collection of taxes by State.); and *In re Fooks*, 139 B.R. 623 (Bankr.D.Md.1992) (The filing of a bankruptcy proceeding for the sole purpose of thwarting Federal tax collection efforts, when other courts (including Federal tax courts) are available to resolve disputes between taxpayers and taxing authorities, *held*, in bad faith, where Chapter 13 debtors had no demonstrable need to reorganize, no legitimate reorganization purpose and had not exhausted their administrative remedies.)

The relief sought by Premier in the filing of the complaint was wholly illusory, because its was not the failure of the State to negotiate in good faith that created the impasse between the parties, but the inability of the parties to come to terms on a new lease. While the complaint is couched in terms of constitutional deprivations, the taking of the Building and other deprivations of property were the products of the agreement of Premier when it entered into the original lease. The lease does not require MPA to compensate Premier for the Building upon termination of the lease.

Premier must have known that any rights it may have had with respect to the Terminal property were dependent upon the lease and , being based upon the State law of contract and State-owned real property, would have to be adjudicated through the administrative processes of the State Courts.

This Court may not compel the MPA to enter into a long term lease with Premier as to Lot 90, or to agree to permit it to sublease Lot 401.

The land in question is State-owned land, under the control and authority of the MPA, which is a unit of the Maryland State Government, over which the State has plenary authority to regulate commerce and the operation of businesses. This Court would not presume to tell the State of Maryland how to operate the Dundalk Marine Terminal. It does not have the authority to tell the State with which tenants to negotiate or those tenants with whom to execute leases. This Court has no authority

48

to tell the State that it may or may not enter into a new lease with a competitor of the debtor.  It has no authority to dictate to the State those terms that it must incorporate in any lease because the State has the complete regulatory power to control the operation of the Port of Baltimore.  The filing of the petition and the instant complaint were means to the end of tying up the State in endless, fruitless litigation.

As to subjective bad faith, the Court finds that there is no possible mechanism in bankruptcy by which the debtor can achieve a legitimate reorganization.  It has thus so far, after more than a year, failed to file a plan, and indeed, it acknowledges that no plan can be filed, let alone confirmed, without the favorable resolution of the litigation against MPA.

A finding of bad faith in the filing of a bankruptcy petition is sufficient cause to grant relief from stay against an offending debtor.  *In re Shady Grove Tech Ctr. Assoc. Ltd. P'ship.*, 216 B.R. 386, 388 (Bankr. D. Md. 1998) ("circumstances which form cause for relief from stay may include a bad faith filing of the case."), supplemented by *Mass. Mut. Life Ins. Co., v. Shady Grove Tech Ctr. Assoc. Ltd. P'ship. (In re Shady Grove Tech Ctr. Assoc. Ltd. P'ship)*, 227 B.R. 422 (Bankr. D. Md. 1998).

### *SUMMARY JUDGMENT*

Summary judgment is appropriate when: (1) the pleadings, depositions, answers to interrogatories, admissions on file and affidavits show that there is no genuine issue of material fact; and 2) the moving party is entitled to judgment as a matter of law. In determining the facts for summary judgment purposes, the court may rely on affidavits made with personal knowledge that set forth specific facts otherwise admissible in evidence and sworn or certified copies of papers attached to such affidavits. Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056; *Bailey v. Blue Cross & Blue Shield of Virginia*, 67 F.3d 53, 56 (4th Cir. 1995); *Miller v. FDIC*, 906 F.2d 972, 973 (4th Cir. 1990). As further delineated in a recent decision of the U.S. District Court for the District of Maryland (Bennett, D.J.):

> In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L. Ed.2d 202 (1986), the Supreme Court explained that only "facts that might affect the outcome of the suit under the governing law" are material. *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505. In that context, a court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed.2d 538 (1986). However, "[w]hen the moving party has met its responsibility of identifying the basis for its motion, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98, 101 (4th Cir.1987) (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed.2d 265 (1986); Fed.R.Civ.P. 56(e))."

*French v. Peninsula Bank*, 338 B.R. 668, 673 (D. Md. 2006).

For the reasons stated, the defendants' motion for summary judgment will be GRANTED, the complaint will be DISMISSED, and the motion for relief from stayed filed by MPA will be GRANTED.

ORDER ACCORDINGLY.

cc:    Charles S. Fax, Esquire
Rifkin, Livingston, Levitan & Silver, LLC
Suite 500
6305 Ivy Lane
Greenbelt, Maryland 20770
Special Counsel to the Plaintiff/Respondent

Joel I. Sher, Esquire
Shapiro Sher Guinot & Sandler
Suite 2000
36 South Charles Street
Baltimore, Maryland 21201
Counsel to the Debtor

Premier Automotive Services, Inc.
2700 Broening Highway
Fifth and B Streets
Baltimore, Maryland  21222
Debtor/Plaintiff/Respondent

Thaddeus Byron Smith, Esquire
Peter W. Taliaferro, Esquire
Assistant Attorneys General
Maryland Port Administration
World Trade Center, 20th Floor
401 East Pratt Street
Baltimore, Maryland 21202
Attorneys for the Maryland Port Authority and Messrs. Flanigan and Royster

Robert L. Flanagan
Department of Transportation
State of Maryland
7201 Corporate Center Drive
Hanover, Maryland   21076
Defendant

F. Brooks Royster, III
Maryland Port Administration
World Trade Center
401 East Pratt Street
Baltimore, Maryland  21201
Defendant

Maryland Port Administration
World Trade Center
401 East Pratt Street
Baltimore, Maryland  21201
Defendant/Movant

Mark A. Neal, Esquire
Assistant U.S. Trustee
Office of the United States Trustee
2636 U.S. Courthouse
101 W. Lombard Street
Baltimore, Maryland  21201